915 So.2d 1081 (2005)
Roy SUMLER, Appellant
v.
EAST FORD, INC., Appellee.
No. 2004-CA-01574-COA.
Court of Appeals of Mississippi.
November 29, 2005.
*1084 Tina Lorraine Nicholson, Jackson, attorney for appellant.
Brenda B. Bethany, C. Michael Ellingburg, Jackson, attorneys for appellee.
EN BANC.
BRIDGES, J., for the Court.

PROCEDURAL HISTORY
¶ 1. On August 26, 2003, Roy Sumler sued East Ford, Inc. in the First Judicial District of the Hinds County Circuit Court. Sumler raised causes of action for breach of contract, fraud, and intentional or reckless infliction of emotional distress based on a transaction with East Ford. The circuit court conducted a trial on the matter on June 1-3, 2004. After Sumler presented his case-in-chief, East Ford filed a motion for a directed verdict. The circuit court took East Ford's motion under advisement. East Ford then presented its case. After both sides rested, the circuit court granted East Ford's motion for directed verdict and entered judgment accordingly. Aggrieved, Sumler appeals and raises five issues, listed verbatim:
I. DID THE TRIAL COURT ERR BY FINDING THAT EAST FORD WAS ENTITLED TO REPOSSESS THE VEHICLE?
II. DID THE TRIAL COURT ERR IN DIRECTING A VERDICT FOR THE DEFENDANT ON THE ISSUE OF FRAUD?
III. SHOULD THE TRIAL COURT HAVE DIRECTED A VERDICT FOR THE PLAINTIFF ON THE ISSUE OF FRAUD?
IV. DID THE TRIAL COURT ERR IN DIRECTING A VERDICT FOR THE DEFENDANT ON THE ISSUE OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS?
V. DID THE TRIAL COURT ERR IN DETERMINING THAT THE ISSUE OF PUNITIVE DAMAGES SHOULD NOT GO TO THE JURY?
Finding no error, we affirm.

FACTS
¶ 2. On January 2, 2003, Roy and Detrice Sumler visited East Ford and shopped for a new car. Interested in a 2003 Ford Expedition, the Sumlers submitted a loan application. According to Sumler, Torrey Williams, a salesman with East Ford, filled out Sumler's loan application in Sumler's name. Sumler reviewed the loan application and signed it. Afterwards, Williams took Sumler's loan application to Daryl Knox, East Ford's finance manager. Sumler claimed that Knox added information to his loan application. In particular, Sumler alleged that Knox falsified Sumler's application to show Sumler had additional income. That is, Knox changed Sumler's application to show that *1085 Sumler, in addition to his income from work, also received $1,313 each month from the Veterans' Administration. Sumler never served in the military, and never received benefits from the Veterans' Administration. Additionally, Sumler alleged that Knox also created a phony statement purportedly sent to Sumler from the Department of Veterans' Affairs. That statement indicated Sumler actually received those benefits listed in his loan application.
¶ 3. Rodney Cummins, East Ford's controller, was East Ford's corporate representative at trial. Cummins testified that Knox implicated Sumler in the forgery. Cummins testified that East Ford never had sufficient proof to turn Knox over to authorities for fraud. Still, Cummins testified that he terminated Knox for falsifying company information.[1] In any event, Knox submitted Sumler's forged loan application and false statement to finance companies. Approved for financing, Sumler signed a promissory note and drove the Expedition home.
¶ 4. Capital One Auto Finance purchased Sumler's promissory note from East Ford. During the course of East Ford's ownership of Sumler's note, Sumler made at least three timely payments to Capital One. In March of 2003, Capital One audited East Ford's accounts and found up to twenty-five instances of falsified applications among those that originated from East Ford. Capital One notified East Ford and East Ford agreed to buy back those loans, including Sumler's. Capital One refunded Sumler's three note payment. Sumler never tendered those payments to East Ford or anyone else.
¶ 5. After East Ford repurchased Sumler's loan, it sold the loan to Financial Services of Mississippi. Rodney Cummins, East Ford's controller and its corporate representative at trial, admitted that Sumler's loan could have remained with Financial Services for the duration of the loan. However, East Ford risked exposure to liability if it allowed Sumler's loan to remain with Financial Services. East Ford sold the loan to Financial Services "with recourse." That is, if Sumler defaulted on the loan, East Ford would have been liable to Financial Services. Based on that possibility, East Ford bought back Sumler's loan from Financial Services.
¶ 6. East Ford wanted Sumler to sign a new contract with Capitol One. East Ford submitted loan applications on Sumler's behalf. Sumler began to receive communications in the mail. Those communications were from finance companies regarding those applications sent by East Ford.
¶ 7. Financial Services sent Sumler a notice on April 11, 2003. By that notice Financial Services informed Sumler that it had bought Sumler's loan. Capitol One subsequently refunded Sumler's three payments. On April 23, 2003, Sumler contacted East Ford to find out where he should send his note payments. Detrice telephoned Financial Services to find out where to send the loan payments. The first time she called, Financial Services told her it did not have her loan information yet. The second time she called, Financial Services informed her that East Ford had repurchased the loan. Financial Services told Detrice to contact East Ford regarding the loan.
¶ 8. Detrice called East Ford and spoke to Joe Smith, one of the managers of East Ford. Smith told Detrice that Sumler's contract was "incomplete." Further, *1086 Smith told Detrice that Sumler needed to sign more papers. Sumler and Detrice went to East Ford and met with Smith. Smith told them that Sumler "lost" his financing because his contract was incomplete. Smith went and got Leo Wilson, who also told the Sumlers that the contract was incomplete.
¶ 9. On May 1, 2003, Kirk Bevins, another East Ford manager, called Sumler and asked Sumler to come to East Ford. The Sumlers went to East Ford on May 2, 2003, and met with Smith again. Smith showed Sumler documents from Capitol One. Those documents indicated that Capitol One approved Sumler for a new loan. The documents reflected a lower loan amount and a higher interest rate. Smith also told Sumler that Sumler would have to put additional money down, because East Ford would not absorb the difference between the new loan and the old loan. Smith told the Sumlers that they could not leave the loan with Financial Services. Under the second Capitol One contract, Sumler would have had to pay $462 for seventy-two months. By the terms of the first contract, the Sumlers were obligated to pay $584 for seventy-two months.
¶ 10. Meanwhile, Sumler never paid any amount on the Expedition. That is, while the Sumlers paid three payments to Capital One, Capital One refunded those payments. The Sumlers never paid any payment after that. On July 10, 2003, East Ford told Sumler that East Ford had a right to repossess the Expedition. Sumler returned the Expedition to East Ford. Aggrieved, Sumler appeals to this Court.

ANALYSIS

I. DID THE TRIAL COURT ERR BY FINDING THAT EAST FORD WAS ENTITLED TO REPOSSESS THE VEHICLE?
¶ 11. In this first issue, Sumler claims that the circuit court erred in finding "[i]t's clear from the evidence, as well as by law based on the evidence, that East Ford was entitled to either repossession of the subject vehicle or a voluntary return of the car by the plaintiff." According to Sumler, the circuit court's finding was contrary to the evidence.
¶ 12. Assuming, for the sake of argument, that Sumler is correct and the circuit court erred when it held that East Ford was entitled to repossess Sumler's Expedition. Even under that assumption, the fact remains that East Ford did not repossess Sumler's Expedition. According to the record, East Ford told Sumler that Sumler would either have to (a) enter into a subsequent contract, (b) return the Expedition to East Ford, or (c) expect East Ford to repossess the Expedition. Sumler returned the Expedition to East Ford. East Ford never repossessed the Expedition.
¶ 13. Though his argument heading does not suggest so, by the substance of his argument, Sumler actually argues that the circuit court erred when it did not find that East Ford should be bound by the original note, procured through Knox's fraud. This is clear by Sumler's suggestion that East Ford hindered Sumler's ability to pay on the note. However, it is important to note that a contract procured by fraud is voidable. Allen v. Mac Tools, Inc., 671 So.2d 636, 642 (Miss.1996). The evidence is undisputed that East Ford was unaware of and did not sanction Knox's fraud in procuring favorable lending on behalf of East Ford customers. This is evident by (1) East Ford's requirement that all employees sign sworn affidavits that they would not commit fraud, (2) East Ford's insistence that all employees record loan closings, and (3) East Ford's decision to terminate Knox.
*1087 ¶ 14. It is also undisputed that East Ford, rather than placing Sumler's note with Capital One, was forced to reacquire Sumler's note. After Financial Services bought Sumler's note, East Ford was forced to, in effect, cosign for Sumler's note, because Financial Services bought Sumler's note "with recourse." That meant that Financial Services could hold East Ford liable for Sumler's default. The evidence is undisputed that East Ford was unwilling to accept that additional liability.
¶ 15. Without a doubt, no evidence suggested that Sumler procured the loan by fraud, but likewise, no evidence suggested East Ford did either. Thus, even if we could say that the circuit court erred when it held that East Ford had a right to repossess the Expedition, which never occurred, we could not say that East Ford did not have the right to mitigate its own liability. So, while Sumler alleges that East Ford could not force Sumler to enter into a subsequent contract, neither could Sumler force East Ford to abide by a contract procured through fraud, but none of its own.
¶ 16. The fact remains that East Ford did not repossess Sumler's Expedition. We resolve this issue not on the basis of our analysis of the voidability of contracts procured by fraud, we simply note that for the sake of consideration. We resolve this issue based on the fact that Sumler complains on the basis of a non-event. East Ford cites McGowan v. McCann, 357 So.2d 946, 950 (Miss.1978) for the proposition that the Mississippi Supreme Court "cannot consider matters not properly a part of the record." It follows that, based on the record before us, no reversible error results. The record clearly demonstrates that there was no evidence East Ford repossessed Sumler's Expedition.

II. DID THE TRIAL COURT ERR IN DIRECTING A VERDICT FOR THE DEFENDANT ON THE ISSUE OF FRAUD?
¶ 17. In this issue, Sumler challenges the circuit court's decision to grant East Ford's motion for a directed verdict on the issue of damages. The circuit court granted East Ford's motion for a directed verdict on the basis that Sumler failed to prove damages "proximately caused by the incident involved with the fraud." Here, Sumler suggests that the jury should have been allowed to consider damages due to loss of use and for emotional distress.
¶ 18. As mentioned, Sumler appeals the circuit court's decision to grant East Ford's motion for a directed verdict. When asked to review a trial judge's decision to grant a directed verdict, this Court conducts a de novo review. Tucker v. Riverboat Corp. of Mississippi, 905 So.2d 741 (¶ 6) (Miss.Ct.App.2004). If we find that the evidence favorable to the non-moving party and the reasonable inferences drawn from that evidence creates a question for the jury, then we must reverse the trial court's decision. Id. That is, a trial court should submit an issue to the jury only if the evidence creates a question of fact over which reasonable jurors could disagree. Id.
¶ 19. Sumler claims that the circuit court should not have granted East Ford's motion for a directed verdict on the issue of Sumler's cause of action for fraud. To demonstrate a prima facie case of fraud, a plaintiff must show, by clear and convincing evidence, (1) a representation (2) that is false (3) and material (4) that the speaker knew was false or was ignorant of the truth (5) combined with the speaker's intent that the listener act on the representation in a manner reasonably contemplated (6) combined with the listener's ignorance of the statement's falsity (7) *1088 and the listener's reliance on the statement as true (8) with a right to rely on the statement, and (9) the listener's proximate injury as a consequence. Southeastern Med. Supply, Inc. v. Boyles, Moak, and Brickell Ins. Inc., 822 So.2d 323(¶ 39) (Miss.Ct.App.2002).
¶ 20. A plaintiff must prove fraud by clear and convincing evidence. Id. Clear and convincing evidence is:
that weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.
Travelhost, Inc. v. Blandford, 68 F.3d 958, 960 (5th Cir.1995) (citations omitted). Clear and convincing evidence is such a high standard that even the overwhelming weight of the evidence does not rise to the same level. In re C.B., 574 So.2d 1369, 1375 (Miss.1990).
¶ 21. According to Sumler, the circuit court should not have granted East Ford's motion for a directed verdict because Sumler presented a question for the jury as to whether Sumler presented clear and convincing evidence of damages resulting from loss of use and emotional distress. We address those two forms of damages in turn.

A. Loss of Use
¶ 22. Sumler argues that the circuit court failed to consider his loss of use of the vehicle. Citing Robinson & Pattison v. Goings, 63 Miss. 500 (1886), and Commercial Credit v. Spence, 185 Miss. 293, 184 So. 439 (1938), Sumler claims that the jury should have been allowed to assign a value to Sumler's loss of transportation.
¶ 23. East Ford disputes Sumler's claim to loss of use and points out that Sumler paid nothing for the Expedition and drove it nearly 15,000 miles over a six-month period. East Ford distinguishes Robinson and Spence. Both cases involve wrongful repossession of property, but East Ford did not repossess the Expedition because Sumler returned it. East Ford also suggests that Sumler cannot suffer damages for loss of use of property he did not own. In both Robinson and Spence, the owner's property was seized and detained, while in Sumler's case, he did not own the Expedition and East Ford did not repossess it. Further, in Robinson, the defendant's employee was considered an agent of the defendant. Here, Knox was not East Ford's agent because Knox directly violated company policy.

B. Emotional Distress
¶ 24. Sumler also claims that the jury should have been allowed to consider his damages for emotional distress. A plaintiff alleging fraud may recover damages for emotional distress and mental anguish. Cook v. Children's Medical Group, P.A., 756 So.2d 734 (¶ 24) (Miss.1999) (citing T.G. Blackwell Chevrolet Co. v. Eshee, 261 So.2d 481, 485 (Miss.1972)). There are well-defined standards for an award for damages stemming from emotional distress.
¶ 25. If a defendant's conduct is outrageous, the plaintiff is not required to prove an injury to recover damages for infliction of emotional distress or mental anguish. Wilson v. General Motors Acceptance Corp., 883 So.2d 56(¶ 35) (Miss.2004). Rather, it is the nature of the defendant's act that justifies the award for compensatory damages. Id. at (¶ 34). The seriousness of the consequences is irrelevant. Id. Thus, a plaintiff who wishes to recover damages for emotional distress must present evidence that a defendant's *1089 conduct evokes outrage or revulsion. Id.
¶ 26. Accordingly, the standard for whether damages for emotional distress are appropriate is whether the defendant's behavior is malicious, intentional, willful, wanton, grossly careless, indifferent or reckless. Id. "[W]here mental distress damages are alleged in connection with intentional tortious conduct, the standard is whether the defendant's behavior is malicious, intentional, willful, wanton, grossly careless, indifferent or reckless." Community Bank, Ellisville, Mississippi v. Courtney, 884 So.2d 767(¶ 28) (Miss.2004) (citing Morrison v. Means, 680 So.2d 803, 805 (Miss.1996)). It is not enough that a plaintiff dislike a defendant's acts, a plaintiff must show that a defendant intentionally and maliciously sought to do the plaintiff harm. Morgan v. Greenwaldt, 786 So.2d 1037(¶ 24) (Miss.2001).
¶ 27. Still, even such a demonstration does not, without more, create a positive showing of compensatory damages for emotional distress. A plaintiff who has been intentionally wronged without demonstrable injury is to be awarded nominal damages. Whitten v. Cox, 799 So.2d 1(¶ 16) (Miss.2000). So, a plaintiff bears the burden of demonstrating a need for compensatory damages beyond nominal damages. Id. That is, a plaintiff may not recover damages for mental anguish unaccompanied by physical or bodily harm without evidence of a willful, wanton, malicious, or intentional wrong. Id. What is more, a plaintiff must also prove that such damages were reasonably foreseeable. Id. at (¶ 19).
¶ 28. The Mississippi Supreme Court has examined similar issues in the recent past. In Community Bank, Ellisville, Mississippi v. Courtney, 884 So.2d 767 (Miss.2004), the supreme court held that a plaintiff's testimony that he suffered stomach problems as a result of losing his equipment and business were insufficient to support a finding that a defendant's behavior was malicious, intentional, willful, wanton, grossly careless, indifferent or reckless and did not prove any type of demonstrable harm. Id. at (¶ 29). Further, the supreme court held that the plaintiff's evidence of mental anguish was insufficient as a matter of law. Id.
¶ 29. In Wilson, the supreme court held that, except for the plaintiff's complaint that she lost sleep, was upset, and had bad dreams, the plaintiff did not present sufficient evidence to support a judgment for emotional distress damages Id. at (¶ 36). Moreover, the supreme court noted that the plaintiff did not present any evidence that he suffered economic hardship, did not present evidence that the defendants did anything intentionally with a foreseeable result of harm to the plaintiff, and did not present evidence that the defendants did anything extreme or outrageous. Id.
¶ 30. Here, there is little testimony among the record regarding Sumler's emotional distress. Sumler's wife, Detrice, testified that Sumler seemed stressed out and upset. Sumler testified that his co-workers asked him where his Expedition was and whether it had been repossessed. Additionally, the following exchange transpired:
Q. All right. Mr. Sumler, you were describing some of the effects this has had on your life. How did it make you feel when East Ford threatened to send the repo man to your house?
A. Angry, upset, embarrassed we had to get to that point, because I think it could have easily been avoided. But just embarrassed and hurt, anguish in my household. And embarrassment, humiliation, just all of *1090 the above. You name it. It was something we could have easily avoided with our same contract.
¶ 31. Thus, Sumler presented evidence, through his own testimony and his wife's, that he was stressed out, upset, angry, embarrassed, hurt, and humiliated. Many of these qualities overlap. For example, one may be embarrassed and humiliated at the same time. Likewise, one may be upset and angry, or even upset and hurt. What is more, Sumler failed to present evidence that East Ford intentionally or maliciously sought to do him harm. In light of the precedent and the foregoing discussion, Sumler did not present a question of fact for the jury. Accordingly, we affirm the circuit court's decision to grant East Ford's motion for a directed verdict.

III. SHOULD THE TRIAL COURT HAVE DIRECTED A VERDICT FOR THE PLAINTIFF ON THE ISSUE OF FRAUD?
¶ 32. The resolution of issue two renders this issue moot. Suffice it to say, we find no error in the circuit court's decision to deny Sumler's motion for a directed verdict on the issue of fraud.

IV. DID THE TRIAL COURT ERR IN DIRECTING A VERDICT FOR THE DEFENDANT ON THE ISSUE OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS?
¶ 33. Because we held that Sumler presented insufficient evidence of East Ford's intent to inflict emotional distress upon Sumler, and Sumler failed to present sufficient evidence of damages from emotional distress, this issue, like issue three, is moot as a result.

V. DID THE TRIAL COURT ERR IN DETERMINING THAT THE ISSUE OF PUNITIVE DAMAGES SHOULD NOT GO TO THE JURY?
¶ 34. In this final issue, Sumler suggests that the circuit court erred when it did not permit the jury to consider whether punitive damages were appropriate. "The trial court, in determining if the issue of punitive damages should be submitted to the jury, must decide whether, under the totality of the circumstances and viewing the defendant's conduct in the aggregate, a reasonable, hypothetical trier of fact could have found either malice or gross neglect/reckless disregard." Hurst v. Southwest Miss. Legal Servs. Corp., 708 So.2d 1347(¶ 6) (Miss.1998) (internal quotations omitted). Thus, we may reverse the circuit court's decision to forego jury consideration of Sumler's punitive damages claim if the circuit court abused its discretion. Id. at (¶ 10).
¶ 35. Section 11-1-65 of the Mississippi Code addresses punitive damages. According to Section 11-1-65:
(1) In any action in which punitive damages are sought:
(a) Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud.
(b) In any action in which the claimant seeks an award of punitive damages, the trier of fact shall first determine whether compensatory damages are to be awarded and in what amount, before addressing any issues related to punitive damages.
(c) If, but only if, an award of compensatory damages has been made against a *1091 party, the court shall promptly commence an evidentiary hearing to determine whether punitive damages may be considered by the same trier of fact.
Miss.Code Ann. § 11-1-65(1)(a)-(c) (Rev.2002).
¶ 36. In issue two, we resolved that Sumler presented insufficient evidence that East Ford acted with actual malice or that East Ford committed fraud. Moreover, it is undisputed that Sumler did not allege that East Ford acted with gross negligence. Rather, Sumler raised claims for fraud and intentional infliction of emotional distress.
¶ 37. Further, Sumler presented insufficient evidence of compensatory damages. Pursuant to Section 11-1-65(1)(b), the trier of fact must determine compensatory damages before addressing punitive damages. Because Sumler failed to present evidence of compensatory damages, it is impossible to consider punitive damages.
¶ 38. Notwithstanding the previous points, Sumler questions the circuit court's decision that East Ford could not be held liable for Knox's fraud because East Ford had a written policy against that type of conduct. Sumler suggests that the circuit court ignored evidence proving that East Ford did not enforce that policy and "turned a blind eye to improprieties." We disagree.
¶ 39. While Cummins testified that Knox was supposed to record loan closings to prevent fraud, and that Knox failed to record loan closings, Cummins also testified that he would have to fire all of his employees if he rigidly adhered to that standard. Additionally, Cummins testified that he could not acquire enough evidence to unequivocally accuse Knox of fraud or forgery, or report Knox to authorities, Cummins, nevertheless, terminated Knox based on the circumstantial evidence before him. Not only that, East Ford required Knox to sign an affidavit by which Knox swore he would not engage in fraud.
¶ 40. As to East Ford's actions regarding its attempts to secure alternative financing, there was no evidence that East Ford attempted to do so maliciously or with the intent to harm Sumler. While the record did show that East Ford did attempt to mitigate its risk exposure after it discovered cases of employee fraud, the record also shows that East Ford was able to secure favorable alternative deals for every effected borrower save Sumler. The record also shows that East Ford attempted to secure a more favorable arrangement for Sumler than in Sumler's original loan agreement, as evidenced by Wilson's testimony that he instructed East Ford employees to do whatever it took to make Sumler happy. While East Ford did expect Sumler to pay for the Expedition, no evidence shows that it acted maliciously or intentionally to harm Sumler. As it turns out, Sumler had to return an Expedition that he once intended to purchase. Still, Sumler drove that Expedition for six months and never paid anything for his use of that Expedition. What is more, East Ford did not repossess that Expedition at the end of that six months. Instead, Sumler returned it.
¶ 41. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY.
NOTES
[1] Sumler alleged that Knox intended to increase the likelihood that a finance company would approve a loan for Sumler, thereby increasing the chance that East Ford would make the sale. Cummins testified that such behavior is a common practice in the new car industry.